WILLIAMS vs UNITED STATES.

Opinion delivered September 25, 1902.

1. *Murder—Threats of Deceased—Instructions.*

In a prosecution for murder, the defendant claiming self-defense, there was evidence of threats made by deceased, some communicated

and others uncommunicated to defendant. The court instructed the jury that "Threats by the deceased against the life of the defendant even though made in his hearing, would not, by themselves justify the taking of his life by defendant. Threats made by the deceased are competent evidence to be considered by you in determining the condition of mind and motive of the deceased at the time of the killing; but unless such threats were succeeded by some overt act, they would not justify homicide, or even a simple assault." *Held*, that such instruction, in connection with the whole charge, was correct.

2. *Criminal Law—Cross-Examination as to Previous Arrests—Credibility of Witness.*

In cross-examination of a defendant, offering himself as a witness in his own behalf, he may be questioned as to previous arrests for the purpose of affecting his credibility; although his character cannot be attacked, by this or other method, unless he first puts his character at issue by evidence in support thereof.

3. *Criminal Law—Remarks of Counsel.*

In a prosecution for murder the defendant testified, on cross-examination, (permitted to impeach his credibility, not his character,) that he had previously been arrested many times, the number he did not know. Government's counsel, in his argument to the jury stated "Luke (the deceased) is before you as a peaceable man. The defendant is before you as a man who has been arrested so often that he cannot tell how often." *Held*, that such remark was within the record and could only have the effect of calling the attention of the jury to the lack of credibility of the defendant as a witness.

Appeal from the United States Court for the Southern District.

John R. Thomas, Judge.

Charles Williams was convicted of murder and he appeals. Affirmed.

On March 15, 1899, the grand jury returned into court at Paul's Valley an indictment for murder against the defendant, Charles Williams, appellant here, together with Henry T. Bowie, and Frank Hunt. On December 6, 1900, defendant Williams, together with Bowie and Hunt, were arraigned, and each pleaded not guilty, and on the same day severance was demanded and granted, and defendant Williams was placed on trial before a jury, which, on December 11, 1900, reported that they could not agree and were discharged. On April 24, 1901, defendant Williams was again placed on trial before a jury, who, on April 26, 1901, returned the following verdict: "We, the jury, duly impaneled and sworn in the above entitled action do find from the law and the evidence the within-named defendant, Charles Williams, guilty of manslaughter in the manner and form as charged in the within indictment.' Signed. A. P. Roberts, Foreman."

In the trial of the above-entitled case, during the argument of counsel to the jury, Moman Pruiet, Esq., of counsel for the government, used the following language: "Luke is before you as a peaceable man. The defendant is before you as a man who has been arrested so often that he cannot tell how often." To which counsel for defendant objected, and moved the court to exclude this from the jury, upon the ground that the defendant had not put his character for peace in issue. The court overruled the motion of the defendant, and refused to exclude the language used, holding that the reputation of defendant, so far as he had put it in the case by his own testimony, was proper; to which ruling of the court the defendant at the time, excepted and still excepts.

The court gave the following charge to the jury:

"In this case the defendant, Charles Williams, stands charged by the indictment with, and is now on trial for, the

crime of murder. Murder is defined by the law to be the unlawful killing of a human being then and there in the peace of the United States, with malice aforethought, either express or implied. Express malice is that deliberate intention of the mind unlawfully to take away the life of a human being, which is manifested by external circumstances, capable of proof. Malice, in general terms, may be defined to be the doing of a wrongful act intentionally, without just cause or excuse. As employed in the foregoing definition of murder, the term "malice' includes in its meaning all those states of the mind under which the killing of a human being takes place without any cause, or extenuate the homicide. 'Malice,' as used in this incident, does not mean mere spite, ill will, or dislike, as it is ordinarily understood, but it means that condition of the mind which prompts one person to take the life of another without just cause or legal justification. There need be no appreciable space of time between the formation of the intention to kill and the killing. They may be as instantaneous as successive thoughts. It is only necessary that the act of killing be preceeded by the concurrence of the will, deliberation, and premeditation on the part of the slayer. Malice includes not only anger, hatred, and revenge, but every other unlawful and unjustifiable motive. It is not confined to ill will towards an individual, but is intended to denote an action arising from any wicked and corrupt motive. Malice may be inferred when any unlawful act is done with a wicked mind, when the fact is attended by such circumstances as evince a plain indication of a heart, regardless of social duty and fatally bent on mischief. Hence malice may be implied from any deliberate and unlawful act of one person against another, however sudden, if the unlawful act be of such a character as to show an abandoned and malignant disposition. Malice, in connection with the crime of killing, is but another name for a condition of a man's heart and mind; and, as no one can loook into the heart or mind of another, and thus learn its condition, the only

way to decide upon this condition at the time of the killing is to infer it from the surrounding facts. The presence or absence of this mental condition marks a boundary which separates the two crimes of murder and manslaughter. Malice shall be implied when no considerable provocation appears, and where all the circumstances manifest an abandoned and wicked disposition. The burden of proving each of the material allegations in the indictment rests upon the government. The defendant is presumed to be innocent of the crime charged, and that presumption abides with the defendant from the initiation of the case until it either be crystallized into a fact, or is overcome by evidence convincing your minds beyond a reasonable doubt of his guilt as charged in the indictment. The unlawful killing being proved, the burden of proving circumstances of mitigation that justify or excuse the homicide devolves on the accused, unless by the proof on the part of the prosecution it is sufficiently manifest that the offense committed only amounted to manslaughter, or that the accused was justified or excused in committing the homicide. If you believe beyond a reasonable doubt from the evidence that the defendant, Charles Williams, within the Southern District of the Indian Territory, at the time prior to the finding of the indictment in this case, to wit, on or about the 13th day of November, A. D. 1898, unlawfully, feloniously, willfully, and of his malice aforethought killed William J. Luke by shooting him with a bullet fired by defendant from a Colt's 45-calibre revolving pistol, you should find the defendant guilty of murder. If you believe beyond a reasonable doubt, from the evidence, that the defendant, while armed with a deadly weapon, which he had concealed in his hip pocket, went to the room where Luke was engaged in a game of cards with several other parties; that he (the defendant) called attention to a matter which provoked and resulted in a hot quarrel between Luke and defendant; that while Luke was standing with his right hand on the back of a chair, and was pointing or gesticulating with his left hand towards

(19)

defendant, who was standing some six feet away, but was not assaulting or attempting to assault the defendant, that the defendant after threateningly announcing his intention to kill Luke, drew his pistol, and unlawfully, feloniously and of his malice aforethought shot and killed Luke,—such killing would be murder. Although you may believe from the evidence that some time after Luke's death a party of men went to where his body lay, and made an examination of the clothing of the deceased for the purpose of ascertaining whether or not there was a pistol or other weapon on his person and although you may believe from the evidence that upon said examination a loaded pistol was found in the pants pocket of deceased, still, if you believe from the evidence that after Luke was killed several parties went up to the room where his body lay, and changed the position of the body, and tied his hands across his breast, and that other parties had access to the room where the body lay, such facts, with the opportunities offered for placing a pistol in the pocket of the deceased after his death may be taken into consideration by you in determining whether or not deceased was armed at the time of the killing. Although you may believe from the evidence that at the time of the killing deceased had a loaded pistol in his pocket, still, unless he made an assault upon defendant by either drawing or attempting to draw said pistol with the manifest or apparent intention of shooting him, such fact did not justify or excuse the shooting and killing of Luke by the defendant, and such fact cannot avail defendant by way of self-defense. If you believe from the evidence that the defendant did not start or provoke the quarrel with the deceased, but that the deceased began quarreling with the defendant without just cause; that deceased cursed defendant applying to him a foul epithet, and threatened to kill defendant; that deceased had a revolver in his pocket; that he arose from his seat, and put his right hand to his right pants pocket in a threatening manner, and attempted to draw his pistol for the purpose of shooting defendant —then and in that case the

defendant had a lawful right to defend himself, even to the extent of taking the life of the deceased. In order to justify the defendant in taking the life of William Luke, it is not necessary for the jury to find that said William Luke did have a pistol in his pocket at the time of said killing, or that the defendant was then and there in actual danger of losing his life or of receiving serious bodily injury at the hands of said Luke; but it is sufficient in law to justify the defendant in taking the life of the said Luke if, from the words and acts of the said Luke at the time, the defendant had reasonable grounds to believe, and in good faith did believe, that the said Luke was then and there about to make an unlawful, deadly assault upon him, the said defendant; and in determining how this may be you must view the facts and circumstances of this case as they then reasonably appeared to the defendant.

"Although you may believe from the evidence that at the time of the killing of Luke by the defendant both the defendant and Luke were engaged in the unlawful business of running a gaming house, and of gambling, and that each of them were violating the law by carrying concealed deadly weapons, these unlawful acts alone would not justify the defendant in taking the life of his partner in crime, since it is as much a violation of the law to kill a bad man as a good man. An assault is an unlawful attempt, coupled with a present ability, to inflict upon the person of another a bodily injury. The defense interposed in this case is self-defense; that is, that it was necessary for the defendant to take the life of the deceased to prevent his either losing his life or receiving great bodily harm. Self-defense, in proper cases, is the right of every person. It may be resorted to by any one who is violently assaulted by another in such a manner as to cause the person so assaulted in good faith to believe that he is in immediate danger of either being killed or of receiving great bodily harm from the assailant, and that the killing of the assail-

ant, appears to be the only means of escaping death or great bodily harm. In ordinary cases of one person killing another in self-defense it must appear that the danger was so urgent and threatening that, in order to preserve his own life, or to prevent his receiving great bodily injury, the killing of the other was necessary, or apparently necessary; and it must also appear that the person killed was the assailant, or that the slayer in good faith endeavored to decline further combat before the mortal blow or injury was given. A bare fear of being killed or of receiving great bodily harm is not sufficient to justify a killing. It must appear that the circumstances were sufficient to excite the fear of a reasonable person similarly situated, and the defendant acting in good faith, and viewing the situation and circumstances from his standpoint, and that the party killing really acted under the influence of such fear, and not in a spirit of revenge. The law of self-defense is a law of necessity, pure and simple. It is not an offensive law, but defensive law. Before the defendant would be justified in killing the deceased, he must be in danger, or apparently in danger, as viewed from his standoint, of either losing his life or of receiving great bodily harm at the hands of the deceased at the place and at the instant when the fatal shot which took the life of deceased (Luke) was fired. Threats by the deceased against the life of the defendant, even though made in his hearing, would not by themselves justify the taking of his life by the defendant. Threats made by the deceased against the defendant are competent evidence to be considered by you in determining the condition of mind and motive of the deceased at the time of the killing; but, unless such threats were succeeded by some overt act, they would not justify homicide, or even simple assault. To justify the defendant in slaying the deceased, the deceased must, at the time of the fatal shot, have been making some overt demonstration which would have led a reasonable man similarly situated (and the defendant acting in good faith, and viewing

the situation from his standpoint) to believe that his life was in imminent danger, or that he was in imminent danger of receiving great bodily injury. A party in the exercise of self-defense cannot use more force than appears to be necessary for his own protection, and if he exceeds the force apparently necessary to his own defense or safety he is guilty of either murder or manslaughter, as defined by these instructions, if the homicide results from his acts. If you believe from the evidence that the defendant willingly and voluntarily and without provocation on the part of the deceased entered into the difficulty at a time when he was not endangered by any acts of the deceased, he is cut off from the law of self-defense; for it is the law, where parties voluntarily enter into a mutual combat, in which one of the parties is slain, such slaying is murder.

"If, upon consideration of the law and the evidence before you, you should conclude that the defendant is not guilty of murder, it is your duty next to consider whether or not, under the law and the evidence, he is guilty of the crime of manslaughter. Manslaughter is the unlawful killing of a human being without malice, express or implied, and without deliberation. The killing of a human being in the heat of passion by or with a dangerous weapon, except where the killing is shown by the evidence to be either justifiable or excusable, is manslaughter. If you believe beyond a reasonable doubt from the evidence that the defendant, within the Southern District of the Indian Territory, on the 13th day of November, 1898, by means of firing a leaden bullet out of a Colt's 45-caliber revolving pistol into the head and brain of William J. Luke, thereby killing the deceased; that said killing was not justified by law, or in necessary or apparently necessary self-defense, but was done in the heat of passion, and that said killing was done without malice on the part of the defendant,—the crime would be manslaughter. and you should so find the defendant guilty. To extenuate an unlawful

killing, and reduce it to manslaughter, two facts must concur: There must be at the time of the killing both passion and provocation.  Provocation without passion will not extenuate, nor will passion merely without provocation reduce the unlawful killing from murder to manslaughter.  You are instructed that what is or is not an overt act of violence—that is, what acts on the part of a person slain would justify the taking of his life— varies with the circumstances of each particular case.  Under some circumstances a slight movement may justify instant action because of reasonable apprehension of danger; under 'other circumstances this would not be so; and it is for the jury passing upon the weight and effect of the evidence to determine how this may be.  Where evidence has been admitted for the purpose of impeaching the testimony of a witness who has theretofore testified in the case, such impeaching testimony can only be considered by you for the purposes for which it was introduced; that is, for the purpose of impeaching the testimony of said witness, and not as original evidence, either in favor of the prosecution or of the defense.  In considering such impeaching evidence, it is proper for you to consider it for the purpose of determniing the weight you will give to the evidence of the witness whose testimony is sought to be impeached, and for no other purpose.  You are the judges of the weight of the evidence and of the credibility of the witnesses.  In determining the weight you will give to the testimony of the several witnesses it is proper for you to take into consideration their appearance and manner of testifying while on the stand; their intelligence or lack of intelligence; their means of knowledge of the matters about which they testify; their interest in the result of the suit; as to whether their story bears the marks of candor and truth, or to the contrary; as to whether it is reasonable or unreasonable; as to whether they, or either of them, have made other and contradictory statements at other times from those made upon the witness stand in this trial; as to whether the testimony of any

witness has been contradicted upon any material matter in this case by other credible and unimpeached witness or witnesses; and, taking all these facts and circumstances into consideration, you should give to the testimony of each of the several witnesses such weight as you think it entitled to under all the cirucmstances of the case. In determining the question of the guilt or innocence of the defendant of the crime of either murder or manslaughter, you should consider all the facts and circumstances in proof before you, guided by these instructions in weighing and applying the testimony. Before you can find the defendant guilty of either murder or manslaughter, you must be satisfied by the evidence beyond a reasonable doubt of his guilt of either murder or manslaughter. Not every doubt which may arise in your minds is of necessity a reasonable doubt, but, in order to be a reasonable doubt, it must amount to a real doubt of the guilt of the defendant. It must be such a doubt as, if arising in the solution of one of the graver affairs of life, would cause a reasonable and prudent man to hesitate, and say: 'I am not satisfied.' In order to be a reasonable doubt, as applied in this case, it must be a substantial doubt of the defendant's guilt, growing out of the contradictory or unsatisfactory nature of the testimony, or a lack of testimony, which, after considering all the facts and circumstances in proof before you, causes you to hesitate, and say, 'I am not satisfied of the guilt of the defendant.' If you have on your mind such a reasonable doubt of the defendant's guilt, then you should resolve that doubt in favor of the defendant and acquit him; but if, after considering all the facts and circumstances in proof before you, you can say that you feel morally certain of the guilt of the defendant as charged in the indictment, you are satisfied beyond a reasonable doubt, and should find the defendant guilty of murder or manslaughter, according to the law and evidence. You must try this case fairly and impartially, without fear, favor, or affection, and your verdict must be based upon the law and the evidence and not

upon presumption, speculation, or suspicion. Do your duty faithfully according to the law as it is given you in this charge the evidence as you have heard it from the mouths of the witnesses, guided by the wisdom of a merciful God, and you will have performed your whole duty."

On May 1, 1901, defendant filed a motion for new trial, which, on May 9, 1901, was overruled by the court. " Comes on now to be heard defendant's motion for a new trial heretofore filed herein, and the court, after hearing said motion, and being fully advised in the premises, doth overrule said motion, to which action of the court defendant then and there in open court duly excepted, and prayed an appeal to the United States Court of Appeals for the Indian Territory, sitting at South McAlester; which said prayer is granted, and defendant, is allowed ninety (90) days within which to prepare and file his bill of exceptions. On this day, defendant being brought to the bar of the court in the custody of the marshal, it is the judgment, sentence and order of the court that said defendant, Chas. Williams, be, and he is hereby, sentenced to the United States penitentiary at Ft. Leavenworth, Kansas, for a period of ten (10) years, beginning from this date; that he pay to the United States of America a fine of one thousand dollars, and the cost of this prosecution; and that be stand committed until said fine and costs are paid. In the United States Court for the Southern District of the Indian Territory, sitting at Paul's Valley, April, A. D. 1901, term."

*H. M. Carr* and *Furman & Mathers*, for appellant.

*W. B. Johnson, U. S. Attorney,* and
*James E. Humphrey, Asst. U. S. Atty.,* for appellee.

TOWNSEND, J. The appellant has filed two assignments of error, which are as follows: First assignment of error: "The court erred in charging the jury as follows: 'Threats by the

deceased against the life of the defendant, even though made in his hearing, would not, by themselves, justify the taking of his life by the defendant. Threats made by the deceased are competent evidence to be considered by you in determining the condition of mind and motive of the deceased at the time of the killing; but, unless such threats were succeeded by some overt act, they would not justify homicide, or even a similar assault.'" Second assignment of error: "The court erred in permitting counsel for the government, in his argument to the jury, to comment upon the character of the defendant for peace and good order, the defendant not having his character for peace in evidence."

The appellant insists that the giving of the instruction alleged as the first assignment of error limits the right of the jury to consider the threat made by the deceased in the presence of the defendant for any other purpose than to determine the condition of mind and motive of the deceased at the time of the killing; and that it fails to tell the jury in plain and direct terms that, if the deceased did threaten the life of the defendant, and accompanied that threat with an act indicating a present purpose and ability to carry it into execution, then the defendant would have the right to act in his self-defense, and kill the deceased upon the ground of reasonable apprehensions of danger. Has not appellant misapprehended said instruction? He seeks to limit it to the "threats made by deceased in the presence of the defendant." The first clause of said charge is as follows: "Threats by the deceased against the life of the defendant, even though made in his hearing, would not by themselves justify the taking of his life by the defendant." This is clearly correct because, unless such threats were succeeded by some overt act in an attempt to carry same into execution, it would not justify the appellant in killing the deceased upon the ground of reasonable apprehension of danger. "Where the offense consists of an

attempt to do injury, there must be, as in other cases of attempt, something more than a mere intention. Some step must be taken toward carrying out the intent. Thus, mere preparation is not enough, nor mere threats unaccompanied with any offer of violence, nor the presentation of a dangerous weapon without manifestation of intention to use it, or accompanied with language indicating the intention not to use it. But pointing a loaded weapon, with words indicating the intention to discharge it, is enough, without an attempt made to actually discharge it; the further prosecution of the attempt being prevented by interference. Mere words will not constitute an assault, but words may be important as giving color to acts, and may make that an assault which would not otherwise be one. The line of criminality is to be drawn between menace only and violence begun to be executed." Section 232, McClain, Cr. Law. "To warrant taking life in self-defense, the danger must be imminent. Mere words or gestures, however insulting, not indicating immediate danger to the person assailed, will not be sufficient; neither will threats which do not indicate a present purpose to carry them out." Section 303, Id. But such communicated threat is always admissible to show the motive of appellant. "Evidence of threats by the deceased, whether made to the accused or others, and communicated to him, is always admissible to show the defendant's motive." Section 326, Underh. Cr. Ev. But there was a threat proven that was uncommunicated to the defendant, as follows: "Q. Did you have any conversation in the room downstairs that morning with Mr. Luke in regard to this defendant? A. Yes, sir. Mr. Humphrey: We object to that. The Court: It is competent. Mr. Carr: State what it was. The Court : Just tell what the deceased said. Mr. Carr: Q. Tell what the deceased said. A. He asked me if I would take a drink of cider, and I said I didn't care if I did, and we took a drink, and he picks up this pistol behind the bar, and I said, 'Bill, what are you going to do with that— Mr. Humphrey: Your Honor, this

man is telling what he said. This is a dead man. We can't bring him here to contradict it. The Court: You can't tell what you said. Tell what the deceased said. Sometimes we have to relax the rule in order to make it intelligible. That is the rule. The court may allow some other matters in order to make it intelligible. Mr. Carr: Q. What did Luke say? A. I asked him what he was going to do with that, and he said, 'If everything don't work right, I am going to kill that son of a bitching partner of mine.' Q. Do you know who his partner was? A. Mr. Williams, I suppose. Q. Do you know? A. They was partners. Q. Partners in that gambling house, were they? A. Yes, sir." The court is always required to tell the jury the law applicable to the facts proven, and the next clause of said charge undoubtedly had reference to said uncommunicated threat, as follows: "Threats made by the deceased are competent evidence to be considered by you in determining the condition of mind and motive of the deceased at the time of the killing." "Uncommunicated threats may be received to corroborate those communicated, and to show the mental condition of the deceased. Sometimes the former may be regarded as of the res gestæ, explaining some act already in evidence; as, for example, to show the mental state of the deceased when the question is, did he intend to harm the accused, and was he the attacking party in the affray during which he was killed? Uncommunicated threats are then relevant to show he provoked the affray, or to explain the intention with which he participated in it, or to illustrate the character of the attack." Section 326, Underh. Cr. Ev. "Threats made by deceased are admissible in cases of doubt to prove that the deceased made the attack. Threats made by the deceased against the defendant are admissible to prove that the deceased was seeking the life of the defendant, though such threats were not known by the defendant until after the killing." See Hughes, Cr. Law & Proc. § 131. "There are cases, however, which hold that uncommunicated threats made by deceased

against the defendant are admissible as tending to show the intention and animus of deceased. The violent, vicious, or lawless character of deceased as known to defendant before the homicide may be proven for the same purpose as antecedent threats; that is, to show the apparent danger to the person assailed. But there must be also proof of some overt act. Moreover, where the homicide has been committed in an encounter, and defendant claims to have been acting in self-defense, but it does not appear which was the aggressor, the character of the deceased as a violent man may be shown as indicating that it was he who brought on the conflict, and that defendant acted in necessary self-defense. And previous threats, not communicated, are admissible under the same circumstances for the same purpose. But antecedent threats, or the bad character of deceased, not known to the defendant, are not thus admissible according to most authorities, unless the circumstances of the homicide are such as to leave it in doubt which party was the aggressor." Section 307, McClain, Cr. Law. The appellant says he is not relying upon uncommunicated threats, but this would not excuse the court from instructing the jury upon all the law applicable to the evidence. Appellant says, "The threat upon which we rely is a threat made to the defendant, accompanied by a hostile demonstration," and briefly quotes the evidence of the threat made at the time of the killing, and says, "The defendant has a right to an instruction applicable to his own evidence, and based upon the hypothesis that it is true." In our judgment, the court very fully complied with the law in this respect by giving the following charges: "If you believe from the evidence that the defendant did not start or provoke the quarrel with the deceased, but that the deceased began quarreling with the defendant without just cause; that deceased cursed defendant, applying to him a foul epithet, and threatened to kill defendant; that the deceased had a revolver in his pocket; that he arose from his seat, and put his right hand to his right

pants pocket in a threatening manner, and attempted to draw his pistol for the purpose of shooting defendant,—then and in that case the defendant had a lawful right to defend himself, even to the extent of taking the life of the deceased." "In order to justify the defendant in taking the life of William Luke, it is not necessary for the jury to find that said William Luke did have a pistol in his pocket at the time of said killing, or that the defendant was then and there in actual danger of losing his life or of receiving serious bodily injury at the hands of said Luke; but it is sufficient in law to justify the defendant in taking the life of the said Luke, if, from the words and acts of the said Luke at the time, the defendant had reasonable grounds to believe, and in good faith did believe, that the said Luke was then and there about to make an unlawful deadly assault upon him, the said defendant; and in determining how this may be you must view the facts and circumstances of this case as they then reasonably appeared to the defendant." "To justify the defendant in slaying the deceased, the deceased must, at the time of the fatal shot, have been making some overt demonstration, which would have led a reasonable man similarly situated (and the defendant acting in good faith, and viewing the situation from his standpoint), to believe that his life was in imminent danger or that he was in imminent danger of receiving great bodily injury." Appellant insists that the latter portion of the foregoing charge on threats is negative in character, and uncertain, if not unintelligible in meaning. Said portion of said charge referred to is as follows: "But unless such threats were succeeded by some overt act, they would not justify homicide, or even a simple assault." In our judgment the following instruction given by the court was sufficiently plain for any intelligent jury to comprehend the same, if not the counsel for appellant. It is as follows: "You are instructed that what is or is not an overt act of violence—that is, what acts on the part of a person slain would justify the taking of his life—varies with the circumstances

of each particular case. Under some circumstances a slight movement may justify instant action because of reasonable apprehension of danger; under other circumstances this would not be so; and it is for the jury passing upon the weight and effect of the evidence to determine how this may be."

The appellant cites only two Indian Territory cases to support his second assignment of error. These cases pass upon the question of the extent to which a cross-examination of the defendant may go for the purpose of affecting his credibility when he offers himself as a witness in his own behalf. Judge Lewis in the case of Oxier vs U. S., 1 Ind. Ter. 93, (38 S. W. 333),—being the first case cited,—says: "As to the question whether a witness could be asked in cross-examination if he had been arrested for larceny, we concur in the conclusion of the trial judge that such question may be asked; that the answer of the witness cannot be contradicted where the question is simply for the purpose of affecting his credit; and that the witness in such case may claim his privilege not to reply, if he choose. This conclusion is believed to be supported by the better reason, is approved by all the text-writers and by the weight of judicial opinion. 1 Best, Ev. § 130; Steph. Dig. Ev. p. 225; 1 Greenl. Ev. § 459; 1 Phil. Ev. 289; 1 Thomp. Trials, § 458; Carroll vs State (Tex. Cr. App.) 24 S. W. 100, 40 Am. St. Rep. 786; Brandon vs People, 42 N. Y. 265; Real vs Same, Id. 270; Wilbur vs Flood, 16 Mich. 40, 93 Am. Dec. 203; State vs Taylor (Mo. Sup.) 24 S. W. 449." And Chief Justice Springer, in concurring with Judge Lewis on that subject, in the same case, stated the law as follows: "It is a well-settled doctrine in this country that a witness may be cross-examined as to specific facts tending to disgrace or degrade him, for the purpose of impairing his credibility, though these facts are purely irrelevant and collateral to the main issue; also, that the extent to which such questions may be allowed is to be determined by the discretion of the trial court, which commits no error unless it abuses its discretion; that the witness may claim

the privilege of declining to answer when the court allows such question, but that, when answers are called for which are material to the issue, there is no privilege. See Steph. Dig. Ev. (Am. Ed.) p. 225, note 1, and numerous American authorities there cited, in which the subject is fully discussed." Oxier vs U. S., 1 Ind. Ter. 96, (38 S. W. 334). In the case of Oats vs U. S., 1 Ind. Ter. 152, (38 S. W. 673),—being the other case cited,—Judge Lewis says: "The point presented was fully considered in the case of Oxier vs U. S., 1 Ind. Ter. 85, (38 S. W. 331.) " See, also, the following: "It is a fundamental principle of the criminal law that the character of a defendant cannot be impeached or attacked by the state unless he puts his character in issue either by becoming a witness in his own behalf or offering evidence in support of his character." See Hughes, Cr. Law & Proc. § 3155. "In most cases evidence involving the whole moral character of the witness will be received upon the reasonable theory that a man who is addicted to vicious habits, or is prone to commit immoral acts, may be presumed to have lost respect for truth, and to be ready to perjure himself when it is to his interest to do so." See Underh. Cr. Ev. § 237. "The accused, when testifying in his own behalf, waives many of the constitutional privileges which belong to him as one accused of crime." See Id. § 60. "A defendant may be questioned as to specific acts calculated to discredit him. Thus, his previous arrest or indictment, his conviction of a felony, a previous imprisonment in a penitentiary or house of correction, his prior contradictory statements, disorderly actions, or the commission of offenses similar to that charged, attempts to bribe witnesses or simulation of insanity, may all be brought out by questions put to him on his cross-examination, to show what credit his evidence should receive." See Id. § 61. "In the light of authority and reason, a defendant, who, at his own option, becomes a witness, occupies the same position as any other witness, is liable to cross-examination on any matters pertinent to the issue, may be contradicted and

impeached as any other witness, and is subject to the same tests as other witnesses." See Hughes, Cr. Law & Proc. § 3011. The following are some of the reported cases, and we believe fully cover all the law upon this subject: In the case of Parker vs State (Ind.) 35 N. E. 1106, the supreme court says: "The appellants, on the trial of the cause, testified in their own behalf, and the state on cross-examination, over their objection, was permitted to ask them as to certain arrests and prosecutions against them occurring in the past, for the purpose of discrediting their testimony. It is contended that in this ruling the trial court erred. We cannot agree with the appellants in this contention. The testimony of an accused who testifies in his own behalf should be subject to the tests applied to the testimony of any other witnesses. It is not to be supposed that the testimony of a witness who is morally depraved, and an habitual law breaker, as a rule, be given the same credit as a witness who is of known moral character. It is proper within the bounds of propriety, to be controlled by the trial court, that the character and antecedents of a witness may be subject to a test on cross-examination, and that questions which go to exhibit his motives and interests, as well as those tending to show his character and antecedents, should be allowed. The extent to which such cross-examinations shall be allowed is largely in the discretion of the trial court." In the case of Crump vs Com. (Ky.) 20 S. W. 390, the court said: "Having assumed the attitude of a witness, appellant was, as has been expressly held by this court, properly subjected to the same tests as any one testifying, and evidence as to her reputation for morality and virtue was therefore competent."

The appellant insists that counsel for the government commented upon the character of appellant for peace and good order, and that the same was error. The comment to which exception was taken is as follows: "Moman Pruiett, Esq., of

counsel for the government, used the following language: 'Luke is before you as a peaceable man. The defendant is before you as a man who has been arrested so often that he cannot tell how often.'" It appears that when appellant was on the stand he was cross-examined by counsel for the government, as follows: "Q. How many times have you been arrested? A. I don't remember. Q. How many times have you been arrested in Paul's Valley? A. Once or twice. Q. Not more than twice? A. I don't know. Q. What were you arrested for? A. For disturbing the peace. Q. Fighting? A. Yes, sir. Mr. Furman, I move your honor to exclude that, because the one purpose on earth of allowing a witness to be questioned about his arrest is as to those offenses which might affect his credibility as a witness. That is the sole basis. If I know the law,—I will submit I don't know much, but some things I do know about it,—and I submit that the only question that can be asked is something which would affect his reputation for truthfulness. The Court: The same rigid requirements with reference to an examination do not apply with reference to a cross-examination. One of the rules is that you may follow a witness through his whole life, his environment, his course of conduct; the whole may be sounded with reference to enabling the jury to determine the character of the defendant. Things, however, which occurred before the alleged offense— These matters which you are inquiring about occurred previous to this crime? Mr. Humphrey: Some of them before and some of them after. The particular points since. The Court: That is not competent. Mr. Furman: Your honor excludes that from the jury? The Court: Yes, sir. Mr. Humphrey: Q. Were you ever arrested before this? A. Yes, sir. Q. For what? A. Gambling. Q. Ever arrested for assault to kill? A. No, sir. Q. Ever arrested for fighting? A. Yes, sir. Q. Where? A. Texas. Q. Ever arrested for anything else? A. Gambling. Q. Ever arrested for anything else? A. Yes, sir, I believe I have been arrested. I was charged once with taking

(20)

a horse that didn't belong to me. I won this horse off a fellow, mind you, and he didn't want to give it up. Q. Were you ever arrested for anything else besides the horse? A. Not that I remember of. Q. Ever arrested for any other fighting before this occurred out here at Foster? A. Yes, sir; I said I had. Q. How many times were you arrested for fighting before you came to Foster? A. I don.t know. Q. About how many times? A. I don't know. Q. Approximate it. Mr. Furman: I desire to be understood as interposing an objection to any arrest for fighting. Your honor overrules it, and we take an exception. The Court: It goes for what it is worth. Mr. Furman: I wish to save the exception. Mr. Humphrey: Q. How many times were you arrested for fighting before you went to Foster? A. I couldn't tell you. Q. Twenty-five times? A. No, sir. Q. Fifty times? A. No, sir. Q. Ten times? A. I don't know. Q. Was it as many as ten? A. I suppose so." It is certainly evident from this examination that counsel did not go out of the record in the comment excepted to, and that such cross-examination was entirely proper, not to put in issue the "character of the appellant for peace and good order," but for the purpose of affecting his credibility as a witness; and the comment of the counsel as quoted could have no other effect than to call the attention of the jury to the evidence of the appellant. The comment in the case of Bradburn vs U. S. was outside of the record, and it is not applicable to the facts in this case.

It is our judgment that the charge excepted to and the ruling of the court below excepted to was correct, and the judgment of the court below is therefore affirmed.